47 So.2d 594

**WEST POINT MANUFACTURING CO.
v. KEITH.**

5 Div. 303.

Court of Appeals of Alabama.
Aug. 8, 1950.

W. Howell Morrow and Morgan S. Cantey, of West Point, Ga., for appellant.

John W. Johnson, Jr., of Lanett, for appellee.

HARWOOD, Judge.

This is an appeal from a judgment of the Circuit Court of Chambers County awarding unemployment compensation to the petitioner, Mrs. Mary H. Keith.

Mrs. Keith, a former employee of the West Point Manufacturing Company, filed her initial claim for benefits under our Unemployment Compensation law on 12 May 1948.

Her claim was disallowed by a Claims Examiner for the Department of Industrial Relations on the grounds that claimant was disqualified under Section 214(B), Title 26, Code of Alabama, in that she had voluntarily left her employment without good cause connected with her work.

Claimant appealed to the Appeals Referee, who, after a hearing at which claimant was present, but at which claimant's last employer was not present, reversed the conclusions of the Claims Examiner, · and ruled that the provisions of Section 214 (B), supra, were not applicable, in that

<span style="page-number">415</span>

claimant had not left her work voluntarily but involuntarily because of illness.

An appeal from the decision of the Appeals Referee was perfected by claimant's last employer to the Board of Appeals for the Department of Industrial Relations.

After a hearing the Board of Appeals rendered a decision holding that claimant was disqualified for unemployment compensation under Section 214(B), and reinstated the determination of disqualification made by the Claims Examiner, and reversed the decision of the Appeals Referee.

Claimant thereupon filed her petition in the circuit court, and after hearing judgment was entered in favor of claimant.

As before stated this appeal is from said judgment and was perfected by the employer.

The only point raised for our consideration by the assignment of errors is whether the lower court "erred in not finding that the claim of appellee comes within the disqualifying provisions set forth in Title 26, Section 214(B) of the Code of Alabama, 1940, as amended," and in "finding the issues in favor of the appellee."

Reports of the various hearings above mentioned are included as exhibits in the record forwarded to this court.

All of the evidence therefore contained in this record tends to show that on April 15, 1948 the claimant, appellee here, quit her job with the West Point Manufacturing Company. Upon the occasion of her leaving she signed a statement that she was quitting because she was "moving to Atlanta, Georgia. Everything is all right on the job. Is planning to work in Atlanta, but doesn't know where at present. Understanding that continuous service record is being broken."

Betty Lou McKemie, of the personnel office of the Company, testified that the above statement was written in accord with information furnished by claimant. In the trial below the claimant testified that she was under great mental strain when the statement was made, and that it was a mistake or she was misunderstood, as ac-

tually she was taking only a limited supply of clothing with her to Atlanta.

The claimant further testified that on January 20, 1948 she had had an operation. She obtained a sick leave at this time for two weeks, but returned to her work in 8 days. She was run down and anemic, and her physician advised her not to work. As a result she was unable to perform her work satisfactorily, and quit on April 15, 1948.

Claimant stated that her physical condition was, to a certain extent, due to the work she was doing, though she added: "I think Dr. Lee can supply that information."

Claimant stated she was familiar with the policy of the Company in granting sick leaves when she quit on April 15. She did not however request a sick leave at this time, as she was advised by someone not to take a leave as it would be just one more thing to think about.

It appears from the record that the policy of the Company in regard to sick leaves was set forth on the reverse side of the paper granting claimant a sick leave when she was operated on, and attention is called to this reverse side on the face of the leave.

This shows that employees might obtain a leave for sickness "for a reasonable period considering the nature of the sickness. Extensions up to four weeks each may be issued only on doctors certificate."

Claimant had been under the care of Dr. A. B. Lee. A certificate by Dr. Lee, introduced before the Board of Appeals hearing, is to the effect that in Dr. Lee's opinion claimant "has been able to do her usual work since April 1948."

In the trial below a written signed statement by Dr. Lee was admitted by agreement that the statement be considered as evidence.

The pertinent portions of this statement was that claimant had been under his treatment in January and March, 1948, and that he had seen her again in July and December 1948. Dr. Lee's statement continues as follows:

"Mrs. Keith was having difficulty with her female organs and was menstruating too freely and too frequently. There was probably a grandular [sic] unbalance behind it or rather causing it. I cannot say that working caused it, but certainly her working and standing on her feet aggravated this menstrual disturbance. I did what we call a 'D & C' which is really a diagnosis and treatment of this menstrual disturbance. You are not interested in the technical part of the treatment, but you can call it a minor operation.

"Along in March, I think it must have been about the time of her last visit to me on March 18th, I do not remember exactly when though, I told her that she should take a thorough rest and should stop working for a while if she hoped to ever get over her difficulties. At that time I did not think she was able to work at any kind of work. I think that any work she might have done would have aggravated her condition.

"Any activity of standing on her feet or any work would have a tendency to aggravate the condition which she had at that time. It would be aggravated by washing clothes, by working in the kitchen, or working around the house, as well as working at the mill, but any kind of work would aggravate the condition. I told her that she should get somebody to help her with the children because she should not work at the house anymore than at the mill.

"When she recovered from her menstrual disturbance, she was suffering from anemia. This anemia resulted from the profuse bleeding which she had suffered for some time. At the time of her last visit to me in March, I believe that excessive bleeding had stopped entirely and her real trouble at that time was the anemia which resulted from it.

"As I stated a while ago no one could say that the physical impairment of Mrs. Keith was caused by her work, or by any other specific activity in which she may have been engaged. I can say that any activity involving physical exertion in her work at the mill, or work at the house, or at play or in any other manner would aggravate her physical condition in which I

found her in the early part of 1948. And which so far as I know, might have existed on April 15th, 1948; I can't say about that because my records do not indicate that I saw her after March 18th, 1948, so, of course, I can't say precisely what her condition was on April 15th, 1948."

 In Henderson v. Department of Industrial Relations, 252 Ala. 239, 40 So.2d 629, 630, the Supreme Court, speaking through Lawson, J., had the following to say in reference to the interpretation of Section 214(B), supra:

"An individual is disqualified for benefits under the Alabama Unemployment Compensation Law if he left his work voluntarily without good cause connected with such work.—Subsec. B, § 214, Title 26, Code 1940, as amended.

"The trial court's judgment denying benefits to Henderson was based on the finding by that court that he had left his work voluntarily and that he did not have good cause connected with such work for so doing.

"There is no insistence made here that the trial court erred in finding that appellant left his work voluntarily. In fact, Henderson admitted that he did leave voluntarily. But he insists that the evidence shows that he had good cause connected with his work for leaving his job and that the trial court erred in finding to the contrary and denying him benefits.

"When a claimant admits that he voluntarily left his employment but seeks to avoid the disqualifications from receiving benefits set up in Subsec. B of § 214, Title 26, supra, *we think that the burden is upon him to show that he had good cause connected with his work for leaving such employment.*

* * * * * *

"Ill health or physical infirmity is, of course, good cause for employees to cease working. But unless the illness or physical infirmity is shown to have resulted from or to have been caused by the employment, the employee is disqualified from receiving benefits when he voluntarily leaves his employment on account of such illness or physical infirmity. In other words, the

cause for quitting may have been a good one, but the cause must have been connected with the work.

"There is nothing in the evidence in this case to indicate that any illness or physical disability which Henderson had on the day he left his employment resulted from the character of work he was required to perform, nor does the evidence support a reasonable inference that such work in any wise increased or made more serious the disability which he claimed he had when he first entered the employ of Alabama Mills, Inc." (Italics ours.)

██ In view of the doctrine announced in the Henderson case, supra, it is our opinion that the lower court has misapplied the law to the facts adduced.

Claimant's own medical witness stated that "There was probably a glandular unbalance behind it or rather causing it," that is, her physical disability, and that he could not say that working caused it, though any physical activity, whether at work, at play, or in any manner, would aggravate her condition.

██ It is but common knowledge that in many, if not most, physical disabilities, physical exertion is contra indicated. Therefore, this fact alone cannot be deemed a good cause for quitting work under our Unemployment Compensation Law unless it is connected with and caused by the work.

In the opinion rendered by the trial court it is set forth:

"The evidence in this case relating to the main issue is conflicting, and the testimony does not unqualifiedly show that the illness of the petitioner was caused by her work; but the court is impressed that, from all the testimony in the case, there certainly is a reasonable inference that the work of petitioner at the mill tended to aggravate, increase and make more serious the disability which petitioner claims she had and which the testimony shows. And because there is a reasonable inference, in the opinion of the court, that the work of petitioner did aggravate or tend to increase her physical disability, the court is of the further opinion that petitioner is entitled

to recover, and is entitled to compensation under the Alabama Unemployment Compensation Law."

We conclude that the trial court was influenced in this conclusion by statements to be found in paragraph 4 of the Henderson case, supra.

In view of the entire decision in the Henderson case, supra, we do think that the Supreme Court meant by any means to say that merely because an employee's physical condition was unfavorably influenced by physical exertion resulting from work, or physical exertion in general, that such employee would be entitled to unemployment compensation, regardless of the connection of the aggravation with the work of the employee.

On the other hand it is our conclusion that before an employee can assert that his quitting a job was for good cause connected with his work, where the good cause asserted is physical impairment, such physical condition must result specifically from the character of the work performed. Where the physical detriment results, as in this case, from physical exertion in general, whether "work, play, or in any manner," rather than from the nature of the work performed, then it cannot be said to be connected with the employee's job. There is no causal connection between the work and the physical detriment, except in the broad sense that any physical exertion might and probably would, be injurious. Such broad meaning cannot rationally be read into the Unemployment Compensation Law, for to do so would in effect convert such law from its admitted scope and purpose, which is to insure the diligent worker against the vicissitudes of enforced unemployment, into a health insurance program, when no such program today exists under our laws.

It is further our opinion that this claimant, by her own conduct in failing to apply for a sick leave has additionally precluded any favorable consideration of her claim.

In ex parte Alabama Textile Products Corporation, 242 Ala. 609, 7 So.2d 303, 141 A.L.R. 87, the Supreme Court pointed out that the Unemployment Compensation Act was *to insure a diligent worker* against the vicissitudes of enforced unemployment *not voluntarily created by the worker*. (Italics ours.)

The claimant had on at least two previous occasions obtained sick leaves. Before the Board of Appeals she stated that she probably could have obtained a sick leave on this occasion.

In her direct examination in the trial below, in answer to question as to whether she knew the policy of the company in reference to leaves answered as follows:

"A. I know them and understand them but they never have been explained, but working there a number of years you understand what is expected. When you need a leave real bad you can get it, but circumstances alter cases and when I was getting my leave a two weeks' leave was considered a great favor, and now you can obtain a ninety day leave of absence and they are grateful to you instead of you being grateful to them."

Claimant further testified that her physician had told her to "clear" from her mind the matter of obtaining a leave.

On the face of printed leave of absence granted claimant in January 1948 appears the following:

"By conforming to the rules published on the reverse side, your record of continuous service will not be broken."

On the reverse side the following rules appear:

"Leave of Absence

"To All Employees:

"The Company wishes as many of its employees as possible to be eligible for vacation with pay and other benefits based on continuous employment.

"Keep Your Work Record Unbroken During any Period of Absence by Obtaining Leave from Your Overseer. This is Your Responsibility.

"By observing the following simple rules you will maintain your continuous work record and help your overseer to keep the job running, during your absence

"Leaves may be granted as follows:

"1. Sickness—For a reasonable period considering the nature of the sickness. Extensions up to four weeks each may be issued only on doctor's certificate."

Claimant testified she did not read this matter. She did however·state she was familiar with the company's rules in reference to leaves, as she had worked for the company for ten years.

■ Claimant did not even apply for a leave. She herself testified she probably could have obtained one. The rules for obtaining such leave appear fairly simple. Had she complied with such rules her job would have probably have been secured.. Had she`even applied for leave and her request been denied her position now would be entirely different. Her non action and lack of diligence in the premises is incompatible with any rational concept of involuntary· unemployment, and thus removes her from the liberal scope of beneficent influences of the act she seeks to invoke.

Reversed and remanded.

CARR, J., concurs in conclusion.